*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re WALKER, Minors.

UNPUBLISHED
January 28, 2020

Nos. 348736, 348739
Wayne Circuit Court
Family Division
LC No. 04-433195-NA

Before: BECKERING, P.J., and CAVANAGH and STEPHENS, JJ.

PER CURIAM.

In these consolidated appeals, respondent-father, C. Walker, and respondent-mother, L. Hayes, appeal as of right the trial court's order terminating their parental rights to their children, SAW and SARW. The trial court terminated the parental rights of both respondents under MCL 712A.19b(3)(g), (i), and (j). Because we conclude that there are no errors warranting relief in either appeal, we affirm.

## 1. FACTUAL AND PROCEDURAL BACKGROUND

Between 2002 and 2017, respondent-mother gave birth to seven children. The family's contact with Children's Protective Services (CPS) began in 2002, following the birth of respondent-mother's first child, TH. Court intervention started in 2004, and by 2007, respondent-mother's parental rights were terminated to her three oldest children, TH, EW, and KH. During these early proceedings, respondent-mother was offered services to address her substance abuse, mental health, parenting skills, and domestic violence. The services were unsuccessful and these issues remained barriers to reunification.

Several years later, in 2010, respondent-mother gave birth to respondent-father's daughter, SW. This child was removed from respondents' care after CPS received a complaint that SW was injured during a physical altercation between respondent-mother and respondent-father. The court declined to terminate respondents' parental rights to SW at the initial disposition and, instead, made the child a temporary ward of the court and provided respondents with an opportunity to participate in a treatment plan and work toward reunification. During this

-1-

time, respondent-mother gave birth to her fifth child, NR,[1] who was also removed from respondent-mother's care. Again, domestic violence, untreated mental health concerns, substance abuse, and unstable housing culminated in the termination of respondents' parental rights to SW and NR in March 2016.[2] Thus, by the time the children at issue in this appeal, SAW and SARW, came into care, respondent-mother's parental rights to five other children and respondent-father's parental rights to one other child had previously been terminated.

When respondent-mother gave birth to SAW in 2016, the child was allowed to go home with respondent-mother and remain in her care for almost three months. However, after CPS became aware that respondents were still in a relationship and likely living together, SAW was removed from respondent-mother's care in November 2016. Six months later, in May 2017, the court denied a request to terminate respondents' parental rights, made SAW a temporary ward of the court, and permitted respondents additional time to work toward reunification. Two months later, respondent-father was arrested and jailed on domestic violence charges. While he remained jailed awaiting resolution of his criminal matter, respondent-mother gave birth to their daughter SARW in October 2017. Shortly thereafter, petitioner filed a petition seeking termination of respondents' parental right to SARW at the initial disposition. In June 2018, petitioner similarly filed a supplemental petition requesting that the court also terminate respondents' parental rights to SAW. After separate hearings on the two petitions in December 2018, the court found statutory grounds to terminate respondents' parental rights and further determined that termination was in the children's best interests. These appeals followed.

## II. DOCKET NO. 348736 (RESPONDENT-FATHER)

Respondent-father does not directly challenge the trial court's findings regarding the statutory grounds for termination or the children's best interests, but he asserts the trial court erred by finding that reasonable efforts were made to reunify the family. Because respondent-father did not raise this issue in a timely manner in the trial court, and did not object to the service plan or argue that the services provided were inadequate, this issue is not preserved for appellate review. See *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). In general, we review a preserved issue regarding reasonable efforts for clear error. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). However, unpreserved issues are reviewed for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. at 9. After reviewing the record, we conclude that respondent-father has failed to demonstrate any error, plain or otherwise.

---

[1] Although R. Robinson was identified as NR's putative father, no legal father was ever established.

[2] This Court affirmed that decision in January 2017. *In re Walker/Robinson*, unpublished per curiam opinion of the Court of Appeals, issued January 24, 2017 (Docket Nos. 332243 & 332244).

Before a court may contemplate termination of a parent's parental rights, the petitioner generally must make reasonable efforts to reunite the family. MCL 712A.19a(2). "The adequacy of the [DHHS]'s efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009). However, a respondent has the responsibility to not only cooperate and participate in the services, he must also benefit from them. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). Our review of the record fails to yield support for respondent-father's assertion that the trial court erred when it concluded that petitioner made reasonable efforts to preserve and reunify this family.

Respondent-father argues that petitioner's efforts at family reunification were not reasonable because necessary referrals were not made to address his substance abuse issues. Specifically, he contends that he should have been referred for inpatient treatment. Respondent-father asserts that such referrals were necessary before he could successfully complete his treatment plan. After reviewing the record, we find no support for respondent-father's position that petitioner's efforts to address his substance abuse issues were deficient.

For several years, petitioner provided respondent-father with services designed to address his substance abuse issues. After SW was removed in 2010, the court-ordered treatment plan included, among other things, parenting classes, individual counseling, substance abuse treatment, and mental health services. Similarly, after the court took jurisdiction of SAW in January 2017, it ordered respondent-father in May 2017 to again participate in services, including random weekly drug screens. In response, respondent-father replied on the record, "I'm not doing none of this." During a family team meeting in June 2017, respondent-father refused to sign the treatment plan and disputed the necessity of services. When respondent-father eventually submitted some drug screens, they were not random. In July 2017, respondent-father was arrested for domestic violence. He was incarcerated for approximately 10 months. During his incarceration, the caseworker mailed a copy of the treatment plan to respondent-father six times. The worker was assured that he received the plan because after the first one was sent, respondent-father tore it up and mailed the pieces back to the worker with a note that said, "thanks, no thanks." When respondent-father was released in May 2018, participation in mental health and substance abuse treatment was a condition of his probation. Similarly, pursuant to his treatment plan, he was again required to participate in random drug screens. Initially, respondent-father would not comply because he did not want to participate in the call-in process. When he did decide to participate in drug screening, he would only do so when he was at the agency for parenting time. This did not qualify as random screening. In any event, respondent-father did screen approximately 10 times during his parenting-time visits. These screens were routinely negative. In August 2018, respondent-father was re-referred for services. These referrals included domestic violence group counseling, mental health treatment, parenting skills, and substance abuse services. Respondent-father submitted three random screens between August and October 2018, and all three were negative. Then, respondent-father was early terminated from services when he simply stopped participating in all treatment in October 2018. Given this record, we find no support for respondent-father's claim that petitioner failed to adequately address his substances abuse issues. Instead, the record demonstrates that respondent-father failed to cooperate with all of the services provided, particularly services that would have assisted in discerning whether he required different or more intensive treatment.

Furthermore, respondent-father has failed to provide any support for his position that if yet another referral for services, including inpatient treatment, had been made, the results likely would have been different. Considering respondent-father's history, there is no basis for concluding that even if additional services or modifications had been pursued, respondent-father would have promptly cooperated with or benefited from these efforts. Under these circumstances, there is no indication that respondent-father would have fared better had additional or alternative services been offered.

Petitioner made the necessary referrals to address both respondent-father's substance abuse and mental health issues. After reviewing the record, we find no merit to respondent-father's assertion that petitioner's efforts were deficient or contributed to his failure to remove the barriers to reunification. While respondent-father faults petitioner for failing to make even more referrals, the record demonstrates that this is a case where respondent-father was unable to sufficiently benefit from the services offered during the years his children were wards of the court living in a foster home. "While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in services that are offered." *In re Frey*, 297 Mich App at 248. Further, "[n]ot only must respondent cooperate and participate in the services, she must benefit from them." *In re TK*, 306 Mich App at 711. In this case, respondent-father did not make any meaningful effort to cooperate in the services that were offered and designed to address the barriers to reunification.

### III. DOCKET NO. 348739 (RESPONDENT-MOTHER)

Respondent-mother challenges the trial court's findings that the statutory grounds for termination were established by clear and convincing evidence. She also challenges the court's finding that termination of her parental rights was in the children's best interests. We find no error in either regard.

In order to terminate parental rights, the trial court must first find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

### A. STATUTORY GROUNDS

The trial court terminated respondent-mother's parental rights under MCL 712A.19b(3)(g), (i), and (j), which permit termination of parental rights when:

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse and the parent has failed to rectify the conditions that led to the prior terminate of parental rights.

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err when it terminated respondent-mother's parental rights under the foregoing grounds. These statutory grounds are supported by many of the same facts.

Between 2006 and 2016, respondent-mother's parental rights to five children were terminated as a result of her mental instability, domestic violence, unstable housing, and poor parenting skills. Throughout the prior proceedings, respondent-mother was provided with services to remove the barriers to reunification. She was unable to demonstrate that she could properly provide for her children and, as a consequence, the court terminated her parental rights to five children. When SAW came into care in 2016, these services continued. Moreover, similar to prior proceedings, the trial court denied the first petition to terminate respondent-mother's parental rights. She was then given additional time to address, among other things, her mental health, anger management, and domestic violence issues. Despite being offered services for an extended period of time, respondent-mother still is unable to provide a safe and stable home for her children. During the termination hearings in this case, petitioner provided clear and convincing evidence that respondent-mother had not overcome the barriers to reunification, which have existed for years.

The evidence clearly and convincingly established that respondent-mother's mental health issues and mental instability remained a barrier to reunification. Respondent-mother was diagnosed with several psychiatric conditions, including bipolar disorder with psychotic features and schizoaffective disorder. She had treated with a psychiatrist since 2003. The prior terminations of respondent-mother's parental rights to her older children were due, in part, to her mental instability. Approximately a month before the December 2018 termination hearing in this case, respondent-mother was hospitalized because of a manic/psychotic episode. She received inpatient psychiatric treatment for 11 days. During her hospitalization, she admitted that she had been off her medication for several years. Upon her discharge, she was instructed to continue her medications. At the termination hearing three weeks later, respondent-mother acknowledged her recent hospitalization but claimed that she was never told a diagnosis, that she did not know why she required hospitalization, and that she believed she was hospitalized for a physical problem. She also admitted that she was not taking any of her medications. Respondent-mother testified that her treating physician told her that she did need any medication. However, the caseworker clarified that the mental health care provider was not going to prescribe any more

medication because respondent-mother did not believe she had a mental illness and the provider did not believe respondent-mother would comply with the medication regime. Clearly, at the time of termination, respondent-mother continued to struggle with mental health issues.

The evidence further supports that the children would be at risk of harm in respondent-mother's care because she was not able to control her emotions due to her mental health issues. Despite treatment, respondent-mother continued to have confrontations with respondent-father, and with other individuals. The caseworker testified that respondent-mother became involved in a physical altercation with a friend, she had issues with her family, and she had an altercation with strangers that resulted in her sustaining a black eye. Another caseworker testified that during a November 2018 telephone conversation, respondent-mother threatened the worker and used a string of profanities. The threats were significant enough that a police report was made. Clearly, at the time of termination, respondent-mother was not emotionally stable and she had not acknowledged the severity of her mental illness or the need for treatment.

There was also clear and convincing evidence that respondent-mother had not adequately addressed the domestic violence issues that have plagued her relationships for years. Throughout her 12-year association with respondent-father, domestic violence was an ongoing concern. Respondent-father was arrested, charged, and jailed on domestic violence charges several times. Moreover, the caseworker made clear that respondent-mother was also abusive and physically aggressive. Respondent-mother was offered domestic violence and anger management counseling. Despite these services, the violence continued. Moreover, respondent-mother continued to maintain a relationship with her abuser. Respondent-mother contends on appeal that she should not be punished because she is a victim of abuse. However, this ignores the fact that respondent-mother appears to have made no effort to sever her relationship with respondent-father. Respondent-mother had a history of misrepresenting to the court and her caseworkers that respondent-father was not living in her home. Just weeks before the termination hearing, it was clear that they were still involved because respondent-father was the person who took respondent-mother to the hospital when she had her psychotic episode and the records indicate that she went home with him after her discharge.

There was also clear and convincing evidence that respondent-mother lacked the necessary skills to properly parent her children. Respondent-mother challenges this conclusion, arguing that she had completed parenting classes and that the evidence was uncontroverted that she had suitable housing for her children. However, while respondent-mother did participate in several services, she clearly did not benefit from them. Respondent-mother's continued relationship with respondent-father evidenced, at the least, poor judgment and suggested that she was unwilling to put her children's needs ahead of her own. Further, while respondent-mother did maintain a home that was structurally suitable and fairly well-equipped, this did not render the home appropriate for her children because she continued to allow respondent-father to be in the home. This was concerning not only because of the violence in their relationship, but because respondent-father was also a convicted sex offender and for most of the relevant time period he was included on the sex-offender registry.

On the basis of the foregoing, the trial court did not clearly err by finding clear and convincing evidence to terminate respondent-mother's parental rights to the minor children under MCL 712A.19b(3)(g), (i), and (j). The evidence supports a finding that respondent-mother

had her rights to five other children previously terminated due to serious and chronic neglect and that she has failed to rectify the conditions that led to the prior terminations. Moreover, respondent-mother was neither in a position to properly parent her children nor reasonably likely to be able to do so within a reasonable time, and the children were reasonably likely to be harmed if returned to her care.

## B. BEST INTERESTS

The trial court did not clearly err when it found that termination of respondent-mother's parental rights was in the children's best interests.

A court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App at 42. The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App at 131.

Respondent-mother simply argues that a bond existed between her and the children. While respondent-mother and the children may have a bond, that factor does not outweigh the children's need for a safe and stable home that is free from emotional volatility and domestic violence. Respondent-mother continued to struggle with mental health issues and she had not adequately addressed her anger management and domestic violence issues. She continued to be involved in altercations with several individuals and she lacked insight into the nature of her conduct. She did not comprehend the severity of her mental illness and the need for treatment. The evidence confirmed that the children would be at risk of harm in respondent-mother's care.

When balancing the best-interest factors, a court may consider the advantages of a foster home over the parent's home and the possibility of adoption. *In re Olive/Metts*, 297 Mich App at 41-42. At the time of termination, SAW was 2½ years old and SARW was just one year old. They had been in care for most, if not all, of their young lives. They were living in the same foster home with another sibling. Their needs were being satisfied and the foster parent had expressed a desire to adopt the children. Thus, it is clearly apparent that the children were in a stable home where they were progressing and that this progress could continue because there existed an individual willing to provide permanency for the children. They were entitled to stability, consistency, and finality. Accordingly, the trial court did not clearly err when it held that termination of respondent-mother's parental rights was in the children's best interests.

Affirmed.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Cynthia Diane Stephens